

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-12-00259-CV

| | | |
|---|---|---|
| In the Interest of E.M.M., Jr., Minor Child | § | From County Court at Law No. 2 |
| | § | of Wichita County (11787-JR-F) |
| | § | December 21, 2012 |
| | § | Per Curiam |

## JUDGMENT

This court has considered the record on appeal in this case and holds that there was no error in the trial court's judgment. It is ordered that the judgment of the trial court is affirmed.

SECOND DISTRICT COURT OF APPEALS

PER CURIAM



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-12-00259-CV

IN THE INTEREST OF
E.M.M., JR., MINOR CHILD

------------

FROM COUNTY COURT AT LAW NO. 2 OF WICHITA COUNTY

------------

## MEMORANDUM OPINION[1]

------------

## I. Introduction

Appellants Mother and Father appeal the termination of their parental rights to E.M.M., Jr.  We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## II.  Factual and Procedural Background

E.M.M. is Mother's third child but her first child with Father.  Child Protective Services (CPS) became involved with Mother's two older children, B. and H., and then E.M.M., because of Mother's drug use.

The trial court admitted a copy of the judgment of termination with regard to Mother's parental rights to H. as well as certified copies of Father's and Mother's criminal convictions and redacted copies of Wichita Falls police department records pertaining to Father and Mother, which we have set out in chronological order below, starting after Father met Mother in 2005,[2] and incorporating relevant testimony about other events where appropriate.  Father said that he and Mother did not start dating until 2010.

- April 6, 2006:  Father possessed a controlled substance, one to four grams (methamphetamine).  He was convicted on April 24, 2008, pursuant to a plea bargain for four years' confinement.  Police records reflect that Father was the driver of a vehicle containing a passenger with outstanding warrants, that police found a bag containing scales and drugs propped under the gas pedal, and that the vehicle reeked of marijuana; a burnt marijuana cigarette and marijuana residue were also discovered in it.

- April 19, 2006:  Father possessed a controlled substance, less than one gram (methamphetamine), and was convicted on April 24, 2008, pursuant to a plea bargain for one year's confinement.  Police records indicate that Father was stopped by the police for a traffic violation and that they discovered Xanax in addition to methamphetamine in the vehicle.

---

[2]The trial court also admitted Father's April 24, 2008 conviction for theft by check ($1,500–$20,000), alleged to have been committed on January 7, 2002, to which he pleaded guilty in exchange for one year's confinement.

- April 29, 2006: Father possessed marijuana, under two ounces, and unlawfully carried a weapon; he pleaded guilty, was convicted of both offenses on May 5, 2008, and received thirty days' confinement. Police records reflect that when police stopped Father for speeding and for failure to signal, they saw Father hand a marijuana cigar to his brother O.M. The search incident to arrest revealed a semiautomatic handgun under the vehicle's hood and a modification of the glove box to allow access to it.

- July 11, 2006: Police records reflect that one of Father's sisters accused Father of assault; however, she later signed a "Drop Charges/Stop Prosecution" form.

- July 17, 2006: Police records reflect that Father was arrested based on pre-existing warrants and then charged with possession of a controlled substance, unlawfully carrying a weapon, and possession of a dangerous drug for items found on him at the time of the arrest; he had several aliases.

- August 30, 2006: Police records reflect that Father was arrested on a warrant and then charged with possession of drug paraphernalia—a scale with white powdery residue; police also found $360 in cash on Father's person.

- September 5, 2006: Police records reflect that Father was arrested for driving while his license was suspended; his passenger was arrested for possession of marijuana.

- October 10, 2006: Father possessed a controlled substance with intent to deliver and was convicted on April 24, 2008, pursuant to a plea bargain for four years' confinement. Police records indicate that Father was stopped for a traffic violation by Wichita Falls police at the request of the North Texas Regional Drug Task Force and found to be in possession of a handgun and narcotics.

- December 20, 2006: Father possessed a controlled substance, four to 200 grams (methamphetamine), and was convicted on April 24, 2008, pursuant to a plea bargain for four years' confinement. Police records reflect that police stopped Father on an outstanding felony warrant and found a container that Father had attempted to conceal, which held several small plastic baggies containing what appeared to be methamphetamine. During a search of

4

Father's person incident to arrest, police found a bag containing what appeared to be marijuana, along with other drugs and drug paraphernalia. Father told police that O.M., had given him the methamphetamine and that the shotgun that police found in the trunk was O.M.'s.

- January 28, 2007: Police records reflect that Father was stopped for speeding; he was arrested for outstanding warrants, and the police arrested his passengers for possession of marijuana and methamphetamine.

- March 3, 2007: Police records reflect that Father was arrested on outstanding warrants and also charged with possession of marijuana, evading arrest, and driving with a suspended license. Police found marijuana on Father during the search incident to arrest and found a scale and small plastic bags in the vehicle.

- March 13, 2007: Police records reflect that Father was arrested for unlawfully carrying a weapon; police also found methamphetamine and drug paraphernalia in the vehicle he was using.

- April 3, 2007: Police records reflect that Father was arrested and charged with possession of marijuana, evading arrest, and driving with a suspended license.

- June 19, 2007: Police records reflect that Father was stopped by police for evading arrest after he refused to pull over; police found methamphetamine, other drugs, a scale, drug packing materials, a fake Texas identification card bearing Father's photo, and a handgun and live rounds in the vehicle.

- August 29, 2007: Police records reflect that Father was charged with aggravated assault related to drugs.

- September 17, 2007: Father possessed a controlled substance, one to four grams (methamphetamine), and was convicted on April 24, 2008, pursuant to a plea bargain for four years' confinement. The police records reflect that police stopped Father for speeding, arrested him on a warrant, and found methamphetamine in his vehicle.

- November 9, 2007: Police records reflect that Father was arrested for outstanding warrants and charged with possession of marijuana found during

5

a search incident to arrest. Police also found a scale with a white powder residue and other drugs.

- November 29, 2007: Father possessed a controlled substance, one to four grams (methamphetamine), and was convicted on April 24, 2008, pursuant to a plea bargain for four years' confinement. Father also possessed marijuana, under two ounces, pleaded guilty, was convicted on May 5, 2008, and received thirty days' confinement. The police report from Father's arrest indicated that he told the arresting officer that he smoked "weed" every day.

- December 29, 2007: Father committed evading arrest or detention using a vehicle and was convicted on April 24, 2008, pursuant to a plea bargain for four years' confinement. Police records reflect that the gang task force was watching Father, who left a nightclub at 11:25 p.m. in a vehicle without the tag light illuminating the license plate. Police also noted that the vehicle swerved as if the driver were intoxicated. When they attempted to stop the vehicle, Father sped away, disregarding traffic signs, before crashing his vehicle. The vehicle search revealed drug paraphernalia, a substance that appeared to be methamphetamine, and $578 in cash.

- August 19, 2008: Mother's parental rights to H. were involuntarily terminated.[3] Mother also testified that she no longer had parental rights to B., but she did not recall whether she had voluntarily relinquished those rights.

- November 18, 2009: Mother possessed and transported chemicals with the intent to manufacture a controlled substance and possessed a controlled substance, one to four grams (methamphetamine). Mother was convicted of these offenses pursuant to a plea bargain on August 4, 2011, receiving three

---

[3]The grounds for termination listed in the trial court's order in addition to the child's best interest included both endangerment grounds, as well as constructive abandonment, failure to comply with a court order that specifically established the actions necessary to obtain the child's return to her, and use of a controlled substance in a manner that endangered the child's health or safety and failure to complete a court-ordered substance abuse treatment program or continuing to abuse a controlled substance after completion of a court-ordered substance abuse treatment program. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (N), (O), (P), (2) (West 2008 & Supp. 2012). Mother admitted that she used methamphetamine while pregnant with H.

6

years' confinement. Mother attributed these charges to her involvement with an earlier boyfriend.

- March 2010: Father testified that he and Mother became a couple around March 2010. He met Mother's son H. when they went to the foster parents' home to take H. a birthday present.

- April 2010: Father and Mother learned that she was pregnant with E.M.M. Father said that after he found out Mother was pregnant, he used drugs "maybe once a week," although he agreed that as a father, he should not be using them. He also agreed that selling drugs was a dangerous job for a father.

- August 6, 2010: Father possessed controlled substances: four to 200 grams (methamphetamine) and under two ounces of marijuana. He was convicted of possessing the methamphetamine on March 15, 2012, pursuant to a plea bargain for six years' confinement. He pleaded guilty to, and was convicted of, possessing the marijuana on March 29, 2012, receiving 180 days' confinement. The August 6, 2010 police records reflect that the gang task force was conducting surveillance of Father's house. When Father drove off with O.M., police checked with dispatch, discovered that Father's driver's license was still suspended, and used that as the basis to stop him. They discovered both methamphetamine and marijuana, along with other drugs, in the vehicle.[4] A search of Father's house resulted in the discovery of more drugs and over $6,000 in cash. During the termination trial, Father admitted that he had sold marijuana and methamphetamine in the past, but he testified that he stopped when he found out that Mother was pregnant. He said that the drugs found on him on August 6 were for his personal use.

- October 12, 2010: Mother tested positive for amphetamines and methamphetamines at a prenatal appointment. Mother admitted to using methamphetamine for a month during the last trimester of her pregnancy with E.M.M.

- December 20, 2010: Mother gave birth to E.M.M. CPS placed E.M.M. with Mother's sister, who lived with Mother's mother.

---

[4]Father testified, "[T]he drugs they found inside the car, nobody admitted to it, and, therefore, they pinpointed—or they put it pretty much on [him] because of [his] priors." However, he also acknowledged that he pleaded guilty to the offenses.

- January 11, 2011: CPS received a referral that drugs were being sold at the house where Mother's sister lived. Debi Key, E.M.M.'s CPS caseworker, testified that CPS removed E.M.M. when, upon investigating the referral, CPS discovered that the safety plan had been violated because Mother had been allowed to spend the night at the house with E.M.M. CPS placed E.M.M. with H.'s adopted mother.[5]

- May 26, 2011: Mother possessed a controlled substance, one to four grams (methamphetamine). She was convicted of this offense pursuant to a plea bargain on August 4, 2011, receiving three years' confinement. Mother attributed this charge to her involvement with Father's brother O.M. Mother said that she and O.M. were pulled over and that she shoved the methamphetamine inside of her body because she did not want to get in trouble. The police records reflect that at the end of May 2011, the police pulled over O.M.'s vehicle for speeding. Mother told police that when O.M. saw the police, he handed a baggie to her and told her to stuff it, so she hid the baggie in her vagina.

- May 31, 2011: Mother complained to her counselor that O.M. had violently assaulted her. She started dating O.M. around six months after E.M.M. was born.

- February 2012: Mother was released from incarceration.

- June 2012: The two-day termination trial began on June 5, 2012.

Mother had tested positive for drug use as recently as a few days before the termination trial began, in violation of her parole. Mother acknowledged that if she violated her parole, she could return to jail to serve the rest of her sentence

---

[5]At trial, Mother complained that CPS did not consider her proposed placement and said that she would have preferred for E.M.M. to be with her cousin instead of with H., who was no longer legally her son. CPS performed a home study on Mother's cousin and her husband, but Key stated that immediately upon E.M.M.'s removal from Mother's sister, there was no one else to place E.M.M. with other than the foster family that had his half-brother. Key described H. and E.M.M. as bonded, and she described the home as safe, loving, kid-friendly, and free of drug and other criminal activity. Mother's cousin attempted to intervene in the case prior to the termination trial, but the trial court granted DFPS's motion to strike the intervention.

and that she could not provide for E.M.M. if she was in prison. Mother's parole officer testified that Mother was not in compliance with her parole because she had violated it four times, with two failures to report on May 8 and May 18, 2012, and then testing positive for drugs at the end of May 2012 and the beginning of June 2012. Mother's parole officer said that if Mother continued to violate her parole, a blue warrant could be issued to return Mother to jail and that Mother's parole completion date was May 29, 2014. Mother agreed that smoking methamphetamine while pregnant endangers the unborn child.

Mother testified that Father may have known "a little bit" about why or how she lost custody of B. and H. In a letter from Father to CPS dated December 23, 2010, Father wrote the following:

> I am writing to you due to the investigation you have on [Mother]. Yes I am the biological father to our child she just gave birth to. I was aware y[']all would be getting ahold of me *due to [Mother's] past*. I just would like to say I promise no problem out of us. *And you may contact me upon my release Jan. 27, 2011 at any time.* [Emphasis added.]

Father was incarcerated in August 2010, when Mother was six months' pregnant and after he had been out of jail for only eight months; he remained incarcerated at the time of the June 2012 termination trial. Father said that he learned that E.M.M. had been taken into CPS custody around the beginning of 2010 and that a caseworker came to meet with him at the jail.

When Father and Mother learned that she was pregnant with E.M.M. in April 2010, Father said that he found them a house so that they could stay away

9

from "the whole drug thing." They lived in the house for around three to four months while he worked as a welder. But Father admitted that he had been involved in drugs—smoking marijuana and methamphetamine—from the beginning of his relationship with Mother in March 2010 until July 2010. Father said that he would buy marijuana for personal use and that he would occasionally smoke it with Mother before they found out she was pregnant. Father said that he knew Mother smoked methamphetamine before she was pregnant and that he would occasionally smoke methamphetamine with her before she became pregnant, while Mother denied at trial that Father had supplied methamphetamine to her before he went to jail or that they had ever used or sold drugs together. The records of Mother's April 5, 2012 counseling session indicate that Mother admitted a history of both using and selling drugs. Father said that he was unaware that Mother had used methamphetamine during her pregnancy after he went to jail, and Mother said that she did not tell Father that she had been using methamphetamine during pregnancy.

Mother and Father both denied that Father's mother R.A. was involved in drugs, and Mother denied that she had obtained methamphetamine from R.A., Father, O.M., or Father's sister I.A. when she was pregnant. Father denied that O.M. or his sisters had sold drugs, although he admitted that he and O.M. had used drugs together. Father said that he and O.M. were close until he found out that O.M. had been dating Mother while Father was in jail. Father denied that he and O.M. had started a gang, but he admitted that he had been associated with

10

Tango Blast, a prison gang, since 2009. He agreed that Tango Blast's sign was a star, but he said that the star on the back of his head was just because he was "into stars."

Mother invoked her right to remain silent when asked whether she had admitted in a jail phone conversation with Father that she had been smoking dope with, and dealing dope for, R.A.[6] Mother testified that she had never done any illegal business for R.A. and invoked her Fifth Amendment right to remain silent when asked if she had ever sold drugs for R.A. But Father gave the following testimony about a phone conversation he had with Mother while he was in prison:

> Q. Isn't it true that in a phone conversation you had with [Mother], she admitted to you that she was moving drugs for your mother—
>
> A. She said—
>
> Q. —"yes" or "no?"
>
> A. Something of that nature.
>
> Q. And isn't it true in a phone conversation with [Mother], she admitted to you that she was smoking dope with your mother, "yes" or "no?"
>
> A. Yes.[7]
>
> Q. And isn't it true in a phone conversation you had with [Mother], you threatened to beat her up, "yes" or "no?"

---

[6]When asked whether R.A. had threatened to beat her up, Mother said that she thought R.A. had just been playing around.

[7]Father subsequently clarified that he did not know if Mother had been smoking methamphetamine, marijuana, or cigarettes.

11

A. Yes, I did.

Q. And that was all over her removing her engagement ring, correct?

A. Yes, ma'am.

Father said that when he had threatened Mother, he was just "playing with her," and he denied having pointed a gun at a different woman and hitting or threatening to hit two others, threatening his ex-wife, or hurting his brother's paramour. He also denied hurting or giving drugs to his ex-wife. Mother testified that Father had never physically hurt her or threatened to hurt her.

Father acknowledged having concerns that Mother was smoking dope with his mother and that Mother was babysitting his niece while engaging in that behavior. Father said he would also be concerned about Mother having seizures—in addition to her drug problem, Mother suffers from seizures related to epilepsy[8]—if she was watching E.M.M. by herself.

Mother was unsuccessful in both of her recent attempts during the case to attend drug rehabilitation; she tried drug rehabilitation while pregnant but then left to move in with R.A. and some of Father's other family members, stating, "I tried to go to rehab, but then I didn't want to be in rehab." Mother attempted rehab

---

[8]Mother testified that she did not regularly take her seizure medication. Mother agreed that using methamphetamine while suffering from seizures put her in danger and could make her incapable of caring for a child. Mother also had a hard time finding and retaining employment because of her medical condition, lack of education, dyslexia, and lack of transportation. Mother agreed that she is not supposed to drive because of her epilepsy; however, she admitted that she had been driving anyway.

12

again after CPS removed E.M.M., but she lasted only seventy-two hours in the program, stating that she got into an argument at the facility about having her cell phone. Key stated that although Mother started rehab, Mother left after two days "for noncompliance and aggressive behavior."

At trial, Mother agreed that associating with methamphetamine users or selling methamphetamine would violate her CPS service plan, and she acknowledged that in her counseling, she had said that she needed to stay away from O.M., some of her old friends, and other members of Father's family in order to change her environment. Mother acknowledged that she had been spending time with Father's family recently, and she agreed that this meant that she had not changed her environment. Mother's plan was to marry Father when he was released from jail and to get E.M.M. back, but she did not complete her service plan.

Key said that Mother had not shown the ability to provide for E.M.M., including stability and a safe home. She testified that Mother endangered E.M.M.'s mental and physical welfare by using drugs while pregnant, by continuing to use drugs throughout the case, and by failing to complete her service plan.

13

Father received a service plan from CPS, which required him to undergo a paternity test;[9] provide CPS with any relatives that he wanted considered for E.M.M.'s placement; research counseling opportunities in prison, participate in those opportunities, and provide proof of completion to his caseworker; maintain appropriate contact with CPS; and contact his caseworker within five days of his release. Father testified that he had complied with his service plan. He completed his GED while incarcerated, and he said that CPS had never been involved with his other children.

The CPS records reflect that Father gave CPS his mother's name as a potential placement but that CPS would not consider R.A. as an appropriate relative placement based on her CPS and criminal history. At trial, Father mentioned a cousin in Oklahoma and a friend in Austin who could take E.M.M. until his release, and he stated that his current plan was not to let Mother have E.M.M. until she started "[to] straighten up her head, . . . going to rehab and—and showing that she's going to be initiativing [sic] taking care of him."

Father testified that he planned to be paroled out to Mother's mother's house and that this would help him stay drug-free "because those—any—I'm not going to be around the influence. And I can say—I'm a man, and I can say 'no' to—to those—you know, to those things." He declined to answer why he would

_____

[9]Father underwent the paternity test, which showed that he was E.M.M.'s father, and the trial court issued an order establishing the parent-child relationship between them.

not want to be paroled to his own mother's house except to say that he did not want to be "around that atmosphere," describing it as "whatever they got going over there. I can't be more specific than that." Father also stated that he thought he and Mother could do a good job of parenting E.M.M. together.

Father agreed that a stable home for a child would not include a father who was in and out of jail numerous times or a father who was using or dealing methamphetamine. When asked about his parenting skills, Father said that he had raised his three other children for ten years before he "started messing up" by smoking marijuana. However, he also testified that he sold and used drugs when he had at least one child but that the drug transactions never took place when any children were around.

Father agreed with the statements that "choosing to use pot and methamphetamines instead of being present for and being a dad for your kid shows that you aren't choosing to be a parent" and "using methamphetamines after [he] realized that [Mother] was pregnant shows that [he wasn't] choosing to be a parent." Father also acknowledged that he had guns in his closet at home that he did not have proper licenses for and that sometimes he would keep guns in the car. He acknowledged that it would be dangerous for a child to have guns lying around in the car. Father also agreed that drug transactions and drug trafficking can be very dangerous, one of the reasons he had to carry a gun.

Father sent three letters to CPS over the course of the case; his December 23, 2010; September 5, 2011; and November 2, 2011 letters were admitted in

15

evidence at trial. Father said that CPS did not send him enough envelopes to write to E.M.M.,[10] but he also acknowledged that he wrote Mother once or twice a week using envelopes that he purchased from the prison store and that he could have purchased envelopes so that he could write to E.M.M.

Father said that he felt like because Mother's parental rights to another child had been terminated, this was affecting his rights to E.M.M. because he did not have the opportunity to have a home study done on his family or on the two placements he suggested at trial. Father testified that he anticipated getting parole and that he had a stable work history and marketable skills in construction and welding. But he also acknowledged that he had once been unemployed for half a year, during which time he said he had been "sitting down, playing video games and smoking pot."

Key testified that while Father was always very cooperative when she visited him in prison, she believed that Father had endangered E.M.M. when he sold drugs after learning that Mother was pregnant. Key stated that E.M.M. was in a licensed foster home with his half-brother and that he had adjusted well to being there. She explained that Father's mother's house was not a good placement because of R.A.'s criminal history. The plan by the Department of Family and Protective Services (DFPS) for E.M.M. was for him to be adopted by his current foster family, to give him permanency. Key said that if Mother's

_____

[10]During his direct examination by his attorney, Father also pointed out that E.M.M. was a toddler and could not pick up a letter and read it.

parental rights to E.M.M. were not terminated, DFPS would re-examine placement of the child with Mother's cousin-in-law L.R.[11]

Margaret Schroeder, the court-appointed special advocate (CASA) on the case, testified that E.M.M.'s foster home with his half-brother was a modest, child-friendly home in which the father was the breadwinner, with longstanding employment, and the mother was a stay-at-home mom. Schroeder had visited the home at least once a month and had seen E.M.M. interact with his half-brother, describing them as very bonded. She described E.M.M.'s daily schedule and said that this was the only home that he had known since he was three weeks' old.

Schroeder stated that Mother's long history and recent instances of illegal drug use caused her concern for E.M.M.'s safety and welfare if Mother's parental rights were not terminated, and she indicated that Father's frequency and length of incarceration also concerned her because she could not "see that you can parent from jail."

Schroeder recommended terminating Mother's and Father's parental rights to E.M.M. and testified that his continued placement with his half-brother is in E.M.M.'s best interest. Schroeder said that she had seen Father in court "quite a

---

[11]L.R. testified that he had not known that Mother was on drugs but that he had known that "there was some involvement with some people that were dealing drugs" around a year and a half before. He called the police and set up an observation of the neighborhood and told Mother that "she needed to quit seeing a lot of the people that she was hanging around and, you know, that they were, you know, not—not good."

few times" but that she had never gone to the jail to talk with him. Schroeder said that Father's parental rights should be terminated because "[h]e's incarcerated. He's in jail. He obviously has issues that ha[ve] kept him from dealing with his other children." On redirect, Schroeder clarified that she was concerned about Father selling and using drugs after he learned that Mother was pregnant and his drug use with Mother before she became pregnant and that she would still ask for his rights to be terminated even if he was not currently in jail, based on his previous activity and lifestyle.

The jury found that Mother's parental rights to E.M.M. should be terminated based on the grounds alleged by DFPS that Mother: knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endangered his physical or emotional well-being; engaged in conduct or knowingly placed the child with a person who engaged in conduct that endangered his physical or emotional well-being; had her parent-child relationship terminated with respect to another child based on an endangerment finding; constructively abandoned the child; or used a controlled substance in a manner that endangered the child's health or safety and failed to complete a court-ordered substance abuse treatment program. The jury also found that termination of Mother's parental rights was in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (M), (N), (P), (2).

The jury also found that Father's parental rights to E.M.M. should be terminated based on the following grounds alleged by DFPS that Father:

18

knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endangered his physical or emotional well-being; engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered his physical or emotional well-being; or constructively abandoned the child; and that termination of Father's parental rights was in the child's best interest. *See id.* § 161.001(1)(D), (E), (N), (2). The trial court entered judgment terminating both parents' rights to E.M.M., and these appeals followed.

### III. *Anders* Brief

Mother's appellate counsel filed an *Anders* brief and a motion to withdraw, declaring that there are no arguable issues and that any appeal by Mother would be frivolous. *See Anders v. California*, 386 U.S. 738, 87 S. Ct. 1396 (1967); *In re K.M.*, 98 S.W.3d 774, 776–77 (Tex. App.—Fort Worth 2003, no pet.). With regard to an *Anders* brief filed in an appeal of termination of parental rights, we have previously stated the applicable standard:

> In our duties as a reviewing court, we must conduct an independent evaluation of the record to determine whether counsel is correct in determining that the appeal is frivolous. *See Stafford v. State*, 813 S.W.2d 503, 511 (Tex. Crim. App. 1991); *Mays* [*v. State*], 904 S.W.2d [920,] 923 [(Tex. App.—Fort Worth 1995, no pet.)]. Only then may we grant counsel's motion to withdraw. *See Penson v. Ohio*, 488 U.S. 75, 82–83, 109 S. Ct. 346, 351, 102 L. Ed. 2d 300 (1988).

*In re K.E.S.*, 02-11-00420-CV, 2012 WL 4121127, at *8 (Tex. App.—Fort Worth Sept. 20, 2012, pet. filed) (mem. op. on reh'g). Mother was given the opportunity to file a pro se brief in response but has not done so.

19

As required under this standard, we have carefully reviewed the appellate record and Mother's appellate counsel's brief. We agree with her appellate counsel that the appeal is wholly frivolous and without merit. We find nothing in the record that might arguably support the appeal. *See id.* Therefore, we grant Mother's appellate counsel's motion to withdraw and affirm the trial court's judgment terminating Mother's parental rights to E.M.M.

## IV. Sufficiency of the Evidence

In four issues, Father complains that the evidence is legally and factually insufficient to support the involuntary termination grounds under section 161.001(1)(D), (E), and (N) and the best interest finding under section 161.001(2).

## A. Standards of Review

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, No. 11-0282, 2012 WL 2617604, at *1 (Tex. July 6, 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)). We strictly scrutinize termination proceedings and

strictly construe involuntary termination statutes in favor of the parent. *Id.*; *Holick*, 685 S.W.2d at 20–21.

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, .206(a) (West 2008). Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 2012 WL 2617604, at *1 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and conservatorship). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2008).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. *Id.* § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.T.*, 34 S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh'g).

In evaluating the evidence for legal sufficiency in parental termination cases, here, we determine whether the evidence is such that a factfinder could

21

reasonably form a firm belief or conviction that the endangerment ground under either section 161.001(1)(D) or (E) or the constructive abandonment ground under section 161.001(1)(N) was proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.* We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the verdict with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated subsection (D), (E), or (N) of section 161.001(1) and that the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder

22

could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## B. Endangerment

Endangerment is defined as exposing to loss or injury, to jeopardize. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see also* Tex. Fam. Code Ann. § 161.001(1)(D), (E). Under subsection (D), we must examine evidence related to the child's environment to determine if the environment was the source of endangerment to the child's physical or emotional well-being. *D.T.*, 34 S.W.3d at 632. Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the "conditions or surroundings" of the child's home under section 161.001(1)(D). *Castorena v. Tex. Dep't of Protective & Regulatory Servs.*, No. 03-02-00653-CV, 2004 WL 903906, at *8 (Tex. App.—Austin Apr. 29, 2004, no pet.) (mem. op.); *In re B.R.*, 822 S.W.2d 103, 106 (Tex. App.—Tyler 1992, writ denied); *see also In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ) (stating that "environment" refers not only to the acceptability of living conditions, but also to the parent's conduct in the home).

Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being was the direct result of the parent's conduct, including acts, omissions, and failures to act.

*J.T.G.*, 121 S.W.3d at 125. Termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *Id.*; *D.T.*, 34 S.W.3d at 634. To determine whether termination is necessary, courts may look to parental conduct occurring both before and after the child's birth. *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.). The factfinder may infer from past conduct endangering the child's well-being that similar conduct will recur if the child is returned to the parent. *See In re D.L.N.*, 958 S.W.2d 934, 941 (Tex. App.— Waco 1997, pet. denied), *disapproved on other grounds by J.F.C.*, 96 S.W.3d at 256, *and C.H.*, 89 S.W.3d at 17. To support a finding of endangerment, the parent's conduct does not necessarily have to be directed at the child nor is the child required to suffer injury. *Boyd*, 727 S.W.2d at 533. A mother's drug use during pregnancy may amount to conduct that endangers the physical and emotional well-being of the child. *In re I.D.J.*, No. 02-11-00367-CV, 2012 WL 2135579, at *3 (Tex. App.—Fort Worth June 14, 2012, no pet.) (mem. op.). Endangerment can also include a father's knowledge that the child's mother abused drugs. *In re U.P.*, 105 S.W.3d 222, 234 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (op. on reh'g).

Because the evidence pertaining to subsections 161.001(1)(D) and (E) is interrelated, we may conduct a consolidated review. *In re M.C.T.*, 250 S.W.3d 161, 169 (Tex. App.—Fort Worth 2008, no pet.); *see also In re M.R.*, 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.) (holding that there was legally

24

and factually sufficient evidence of both endangerment grounds when, among other things, the evidence showed that the mother exposed her children to domestic violence and refused to participate in her CPS service plan).

Father argues that he "committed no acts resulting in placement of his child with persons who endangered his child" because he was incarcerated and not present when the child was born or removed or during the case's pendency. He further argues that because he was unaware of Mother's methamphetamine use during pregnancy, he did not endanger E.M.M.

However, while incarceration alone is not a sufficient basis for terminating parental rights, it is an appropriate factor to consider, and courts may also consider parental conduct that occurred both before and after the child's birth. *In re B.P.W.*, No. 02-05-00288-CV, 2006 WL 2507340, at *1 (Tex. App.—Fort Worth Aug. 31, 2006, no pet.) (mem. op.). In *B.P.W.*, the father committed two burglaries a month before the child was born and committed a theft a few days before the child's birth. *Id.* He was arrested three days after the child was born, charged with and convicted of the three offenses, and was incarcerated for the first three years of his child's life. *Id.* His first attempt at parole had been denied when prison authorities found him in possession of gang documents. *Id.* During the child's first two years, the child's mother also committed several offenses and was incarcerated at the time of the termination trial, and the father could not enunciate a definite plan for the child's care. *Id.* at *2.

25

We noted in *B.P.W.* that the record showed that the father had engaged in a continuing course of crime that spanned from several years to just days before the child's birth, even though he knew that his conduct could result in his incarceration and separation from his child, and that the father then became involved with a gang in prison, which jeopardized his chances for an early parole. *Id.* Because a child's emotional well-being can be negatively affected when parents repeatedly commit criminal acts that subject them to incarceration that results in their being absent from the child's life and unable to provide support, and because the father's acts created an emotional vacuum in his child's life and subjected the child to ongoing uncertainty regarding who would care for him, we held that the evidence was legally and factually sufficient to support the endangerment finding. *Id.*

We reach the same conclusion here. It is apparent from the record that Father's priorities throughout the case were not focused on E.M.M. Rather, he maintained contact with his family and Mother—individuals who he knew were drug users and dealers—and associated with a prison gang, making his likelihood of parole uncertain. *See id.* The jury could have reasonably chosen to disbelieve his testimony that he did not know Mother had been using drugs while pregnant since he admitted to using drugs with Mother in the past, and he deliberately continued to engage in drug use when he learned that Mother was pregnant, despite the eventual likelihood that he would be returned to prison for his activities. *See, e.g., In re C.D.*, No. 02-10-00070-CV, 2011 WL 1743688, at

26

*7 (Tex. App.—Fort Worth May 5, 2011, no pet.) (mem. op.) ("Each time these parents were jailed, they were absent from their children's lives and unable to provide a home or support, which negatively impacted the children's living environment and well-being."). The jury could have reasonably chosen not to believe that the quantity of drugs that Father possessed in August 2010 was for his personal use in light of his extensive drug-dealing history set out above and the police records indicating that Father's house, which had been under surveillance by the gang task force, contained more drugs and over $6,000 in cash. The jury was entitled to instead believe that Father had continued not only to use drugs but also to sell them even after he learned that Mother was pregnant. And Father's concern about Mother using drugs with and selling drugs for his family members also supports the jury's endangerment findings. Because the evidence was legally and factually sufficient to support the jury's endangerment findings, we overrule Father's first two issues. Based on our resolution here, we need not reach Father's third issue. *See J.L.*, 163 S.W.3d at 84; *see also* Tex. R. App. P. 47.1.

27

## C. Best Interest

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008). The following factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment:

(1) the child's age and physical and mental vulnerabilities;

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the harm to the child;

(4) whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency;

(5) whether the child is fearful of living in or returning to the child's home;

(6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

    (A) minimally adequate health and nutritional care;

    (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

    (C) guidance and supervision consistent with the child's safety;

    (D) a safe physical home environment;

    (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and

    (F) an understanding of the child's needs and capabilities; and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.

*Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A)    the desires of the child;

(B)    the emotional and physical needs of the child now and in the future;

(C)    the emotional and physical danger to the child now and in the future;

(D)    the parental abilities of the individuals seeking custody;

(E)    the programs available to assist these individuals to promote the best interest of the child;

29

(F)     the plans for the child by these individuals or by the agency seeking custody;

(G)     the stability of the home or proposed placement;

(H)     the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)     any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).

These factors are not exhaustive; some listed factors may be inapplicable to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

Father argues that the evidence is legally and factually insufficient to show that termination of his parental rights was in E.M.M.'s best interest. Father complains that DFPS never intended to reunite the family and that his plans for E.M.M. were "that the child go live with people in his family," to grow up with him, and to meet his half-siblings in Father's family. He contends that the "only factor is that [Father] has been incarcerated, and this is insufficient evidence as to the child's best interest."

Father ignores the evidence about his lifestyle presented at trial: from April 2006 until the time of the termination trial in June 2012, Father had engaged in a continuing course of illegal conduct, leading to multiple convictions for drug

30

offenses, or been incarcerated for that illegal conduct. Father's family, particularly his brother O.M., had also engaged in this dangerous and unstable lifestyle with Father. *See, e.g.*, Tex. Fam. Code Ann. § 263.307(b)(8) (stating that a factor to be considered in determining whether the child's parents are willing and able to provide the child with a safe environment is whether there is a history of substance abuse by the child's family or others who have access to the child's home). And Father even explained that he did not want to be paroled to his mother's house because he did not want to be around "whatever they got going over there." *See id.* Although Father testified that CPS had never been involved with his other children, the jury could have reasonably concluded that this was because Father had not been directly involved in their lives in recent years.[12]

Father agreed that a stable home did not include a father in and out of jail or using and dealing drugs, and Key testified that DFPS's plan for E.M.M. was for him to be adopted by his current foster family, which had adopted his half-brother H., to give him permanency. *See id.* § 263.307(b)(12)(D) (noting that a best interest factor to consider is whether adequate parenting skills are demonstrated, including a safe physical home environment); *see also Holley*, 544 S.W.2d at 371–72 (noting that a best interest factor includes the stability of the proposed

---

[12]Father testified that when the children needed something, his ex-wife would contact him and he would make sure they got it. He said that he "chose to step away from" the children because of his lifestyle choice with regard to drugs.

31

placement). Key described H. and E.M.M. as bonded, and she described the home as safe, loving, kid-friendly, and free of drugs and other criminal activity. Key said that E.M.M. called his foster parents "mommy" and "daddy" and that it would be traumatic for E.M.M. to leave that home since he had been there since January 2011. Schroeder, the CASA worker, also described E.M.M. and H. as very bonded.

Viewing the evidence in the light most favorable to the finding and judgment, we conclude that a factfinder could have reasonably formed a firm belief or conviction that termination of Father's parental rights was in E.M.M.'s best interest. *See J.P.B.*, 180 S.W.3d at 573–74. Likewise, giving due deference to the factfinder's evaluation of credibility, we conclude that based on the entire record, the jury could have reasonably formed the same firm belief or conviction with regard to the child's best interest. *See H.R.M.*, 209 S.W.3d at 108. Therefore, because the evidence is legally and factually sufficient to support the best interest finding, we overrule Father's fourth issue.

## V. Conclusion

Having granted Mother's counsel's motion to withdraw and having overruled all of Father's dispositive issues, we affirm the trial court's judgment terminating Mother's and Father's parental rights to E.M.M.

PER CURIAM

PANEL: MCCOY, MEIER, and GABRIEL, JJ.

DELIVERED:  December 21, 2012